OFFICE COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - -x

SOCIETE DES BAINS DE MER ET DU       :
CERCLE DES ETRANGERS A
MONACO,                              :

             Plaintiff,       :

     vs.                            :

MGM MIRAGE AND VICTORIA
PARTNERS, L.P.                       :

          Defendants.          :

- - - - - - - - - - - - - - - - - - - - - - - -x

**ECF Case**

Case No. 08-CV-03157

**DEMAND FOR JURY TRIAL**

RECEIVED
APR 0 1 2008
U.S.D.C. S.D. N.Y.
CASHIERS

## AMENDED COMPLAINT

Plaintiff Société des Bains de Mer et du Cercle des Etrangérs à Monaco ("SBM" or "Plaintiff"), by its attorneys Quinn Emanuel Urquhart Oliver & Hedges LLP, for its Complaint against Defendants MGM Mirage and Victoria Partners, L.P. ("Victoria Partners"), alleges as follows:

## PRELIMINARY STATEMENT

1.     Of all the gaming venues in the world, Monaco's Casino de Monte-Carlo ranks among the most well known and the most exclusive. The worldwide fame and prestige of the Casino de Monte-Carlo are the result of SBM's consistent, earnest efforts over a century and a half, beginning in 1863. Just as SBM has built and maintained a world-class brand for casino services in the MONTE-CARLO mark, legitimate would-be competitors of SBM devote equivalent efforts to the creation, development, and maintenance of competitive brand identities. Unfortunately, there are those in the gaming industry, as in many others, who take the shortcut, selecting piratic imitations. Such illegitimate competition results, as here, in an unearned ride to

recognition and financial gain. This action presents a classic case of such free riding. Surely aware of the fame and endurance of the Casino de Monte-Carlo, and undoubtedly because of that fame and endurance, Defendants adopted "Monte Carlo" as the name of their casino and hotel in the heart of the gaming industry in the United States, Las Vegas. Defendants' actions created the unmistakable impression, persisting today, that their start-up was approved by or otherwise related to SBM's renowned Casino de Monte-Carlo.

2.    While Defendants' use of the "Monte Carlo" designation has always been illegal, flagrant, and unabashed, Defendants have more recently begun to take the offensive. For the first time since commencing use, Defendants are not only attempting to obtain the significant benefits of a federal trademark registration for the name "Monte Carlo" for themselves, thus purporting to acquire nationwide ownership, recognition, and legitimacy for a pirated brand identity, but also are now opposing Plaintiff's own federal trademark applications for MONTE-CARLO marks and threatening to bring their own trademark claims against SBM. Defendants overtly and aggressively purport to own dominant rights in the United States in a mark that is not legitimately theirs, now or ever, for casino and hotel services, in Las Vegas or anywhere else.

3.    The low-quality level of services Defendants have provided in connection with the "Monte Carlo" designation, compared to the brand to which they have illegally attached themselves, dilutes and tarnishes SBM's famous mark CASINO DE MONTE-CARLO.

4.    Plaintiff seeks permanent injunctive relief, damages, and its fees and costs incurred in this matter for Defendants' acts of unfair competition, trademark infringement, trademark dilution, cybersquatting, and related claims under federal and New York statutory and common law. Such relief is necessary to prevent Defendants' continued fostering of consumer confusion and injurious false identification and association between Defendants and SBM.

## THE PARTIES

5.      Plaintiff SBM is a société anonyme organized and existing under the laws of the Principauté of Monaco, enrolled with the registry of companies of Monaco under number 56 S 00523, with a principal place of business at Place du Casino, Monte Carlo MC 98000 Monaco, Principauté de Monaco.  SBM has an additional place of business, operated in conjunction with the Principauté de Monaco, located at 565 Fifth Avenue, New York, New York 10017.

6.      Upon information and belief, Defendant MGM Mirage is a Delaware corporation with its principal place of business in Las Vegas, Nevada.  Upon information and belief, MGM Mirage is the ultimate parent company of Victoria Partners.

7.      Upon information and belief, Defendant Victoria Partners is a Nevada partnership, which owns and operates the Monte Carlo Resort & Casino Las Vegas at 3770 Las Vegas Blvd. South, Las Vegas, Nevada 89109.

## JURISDICTION AND VENUE

8.      Plaintiff brings this action for federal unfair competition in violation of Section 43(a) of the Trademark Act of 1946, as amended (the "Lanham Act"), 15 U.S.C. § 1125(a); federal trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); federal trademark dilution in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); federal cybersquatting under the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(1); injury to business reputation and trademark dilution in violation of Section 360-*l* of the New York General Business Law; and trademark infringement and unfair

competition in violation of the common laws of the State of New York and of the several states of the United States.

9.    This Court has original jurisdiction under 15 U.S.C. § 1121(a) and 28 U.S.C. §§ 1331, 1338(a) and 1338(b).  This Court has supplemental jurisdiction over all other claims asserted herein under 28 U.S.C. § 1367(a).

10.    This Court has personal jurisdiction over Defendants under New York Civil Practice Law and Rules § 302 by virtue of their transacting business and/or contracting to supply goods or services in the State of New York, their commission of tortious conduct as described herein within the State of New York, and their commission of tortious conduct as described herein outside the State of New York, causing injury to Plaintiff within the State of New York, with the actual or reasonable expectation that said conduct will have consequences in the State of New York, and Defendants' deriving substantial revenue from interstate commerce.

11.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and 1391(c).

## THE HISTORY OF THE RENOWNED CASINO DE MONTE-CARLO AND SBM'S RELATED BUSINESS ACTIVITIES

12.    The Principauté de Monaco ("Monaco") is a constitutional monarchy located on a small piece of land, smaller than the area of Central Park in New York City, which is divided into four quarters.  The most well known of these quarters is Monte Carlo.  Monaco is well known for its many high-end attractions such as the Monaco Grand Prix, which is one of the most important and prestigious automobile races in the world; the Monte Carlo Masters, an annual men's professional tennis event; jazz festivals; cabaret; art shows; opera; casino gambling and other leisure activities.

13.    Continuously since 1863, SBM has enjoyed a government-granted monopoly over casino gambling and games in Monaco.  A true and correct copy of the Privilege des Jeux,

granting SBM its monopoly, is attached hereto as Exhibit A. The Privilege des Jeux was

renewed most recently by the Ordonnance Souveraine no. 15-732 of March 13, 2003, attached

hereto as Exhibit B. As indicated in Exhibit B, SBM will retain the exclusive right to conduct

casino gaming within Monaco until at least April 1, 2027.

14.    SBM is a venerable and important body within the international gaming and resort

industry. At present it owns and operates five high quality casinos in Monaco, as well as four

luxury hotels and numerous spas, restaurants, and entertainment venues. These high-end

properties include the following: Casino de Monte-Carlo, Monte-Carlo Bay Hotel & Resort,

Monte-Carlo Beach Hotel, Hotel de Paris - Monte-Carlo, Monte-Carlo Bay Casino, Monte-Carlo

Spa, Monte-Carlo Golf Club, Monte-Carlo Country Club, Monte Carlo Beach Club, Cabaret du

Casino de Monte-Carlo, Monte-Carlo Jazz Festival, Sporting Monte-Carlo, Therme Marins

Monte-Carlo, and Mosaïk Monte-Carlo.

15.    Of all of the attractions for which Monaco is well known, the most enduring and

venerable is SBM's Casino de Monte-Carlo. Built in 1863 on the Plateau des Speluges, at its

inception, the Casino de Monte-Carlo was both physically and culturally Monaco's sole and

central focus. In 1866, at SBM's request, the Plateau des Spelugues was renamed so as better to

reflect the glamour and style of the new casino; Prince Charles III selected the name "Monte-

Carlo," and the casino itself then also acquired its now-word-recognized appellation CASINO

DE MONTE-CARLO. Situated atop the hill overlooking the Mediterranean and its French and

Italian neighbors, the Casino de Monte-Carlo was the Principauté's lone social establishment.

Over the next several decades, the area immediately surrounding the Casino de Monte-Carlo was

developed, so that SBM's casino guests would have convenient, proximate amenities.

16.     The Casino de Monte-Carlo is, itself, a work of art.  Designed by famed architect Charles Garnier, the structure boasts frescoes in the style of Boucher, bas-reliefs, sculptures and caryatids, Ionic columns, Bohemian glass chandeliers, rococo ceilings, and a notable gold and marble atrium

17.     Over time, by the 1930's, the mountainside itself and the land at the mountain's base boasted resort facilities.  The decades-long development of Monaco's luxurious hotels, restaurants, spas, and entertainment venues was literally designed around SBM's Casino de Monte-Carlo, as the Principauté's central attraction, and aimed to replicate the elegance and style that the world had come to associate with it.

18.     The glamour and luxury for which Monaco is recognized today can thus be traced directly to the creation of the high-class reputation that SBM has painstakingly cultivated over more than a century in its Casino de Monte-Carlo.  The goodwill embodied by SBM's CASINO DE MONTE-CARLO brand is immeasurable.

### SBM'S OWNERSHIP, PROTECTION, AND PROMOTION OF ITS CASINO DE MONTE-CARLO TRADEMARK

19.     SBM actively and extensively advertises and promotes its Casino de Monte-Carlo and other casinos through various channels and media, including print and broadcast media, film and the Internet, and uses the mark MONTE CARLO to identify its casino-related goods and services.  Though worldwide in its scope, much of this promotion is aimed at North American consumers.  A significant percentage of SBM's annual worldwide advertising and promotion budget is spent on marketing within the United States, which amount does not include the thousands of dollars SBM expends annually in connection with "invitations" to select, high-rolling gamblers in the United States.  Furthermore, for over twenty years, SBM has maintained an office in New York, which it shares with the Official Monegasque Consulate and the Monaco

Government Tourism Office, for the purposes of promoting, selling stays at, and visits and services relating to, SBM's Monaco-based hotels and casinos.

20.     Through its New York and Monaco offices, SBM promotes its casinos in the United States by participating in trade shows, arranging for advertising through the print and broadcast media, charity partnerships and other charitable activity, direct mail and telephone marketing, and group and individual sales activity. Hundreds of brochures advertising SBM's Casino de Monte-Carlo and other casinos are mailed to clients throughout the United States from SBM's New York office every year. Plaintiff also publishes and distributes throughout the United States its English-language publication "Société," dedicated to tourism in Monaco and the resorts owned by SBM. "Societe" promotes and/or makes frequent reference to the Casino de Monte-Carlo.

21.     Additionally, SBM owns domain names incorporating its famous CASINO DE MONTE-CARLO trademark at which it operates websites promoting its casinos and related goods and services. These websites include, among others, <http://en.montecarloresort.com>, <http://www.casinomontecarlo.com/en>, and <http://www.casino-monte-carlo.com/en>, all of which are available in English and are frequently visited by United States consumers of gaming and hotel services. Monaco's official tourism site, at <http://www.visitmonaco.com> and which is available in English, also promotes the Casino de Monte-Carlo.

22.     SBM also engages marketing and public-relations firms in the United States to promote the Casino de Monte-Carlo and SBM's other properties..

23.     In addition to SBM's advertising, marketing, and sales within the United States, the media and general public have frequently used SBM's CASINO DE MONTE-CARLO mark. As a famed institution, the Casino de Monte-Carlo garners a significant amount of unsolicited

media coverage.  The Casino de Monte-Carlo is frequently the subject of newspaper and magazine articles and has been featured in full length books.  In the United States especially, for many years, and long before Defendants' activities complained of here, the Principauté of Monaco and the brands with which it is associated, including SBM's casino and hotel brands, have special resonance, because the famous and glamorous Hollywood actress Grace Kelly gave up her career to marry the Prince of Monaco, become a princess, and live in the royal castle there.  In addition, many motion pictures, distributed and aired in the United States, have been filmed in, based on, or feature Monaco and the Casino de Monte-Carlo, including, without limitation, "Foolish Wives" (1922), "Monte Carlo" (1930), "The Man Who Broke the Bank at Monte Carlo" (1935), "Charlie Chan at Monte Carlo" (1937), "Rebecca" (1940), "To Catch a Thief" (1955), "Kaleidoscope" (1966), "Never Say Never Again" (1983), "Dirty Rotten Scoundrels" (1988), "Ocean's Twelve" (2004), and "GoldenEye" (1995).

## SALES TO UNITED STATES RESIDENTS OF SBM'S CASINO SERVICES

24.     Through its New York and Monaco offices, SBM opens credit-lines for, and facilitates the pre-purchasing of casino chips by, United States residents planning to visit and gamble at the Casino de Monte-Carlo.

25.     Through its New York and Monaco offices, SBM books stays at its various hotels for United States residents.  All guests staying at an SBM-owned hotel receive a "Carte d'Or" ("Gold Card"), which entitles visitors to, inter alia, unlimited free entry to the Casino de Monte-Carlo, for which a ten Euro fee per visit would otherwise be charged.

26.     SBM also engages agents in the United States for the purpose of recruiting high-stakes gamblers to the Casino de Monte-Carlo.  The recruitment efforts of SBM's United States-

based agents are calculated to, and do, generate gambling revenues at the Casino de Monte-Carlo in excess of a half-a-million dollars annually.

27.    SBM's widespread marketing and sales activities in the United States have succeeded in attracting thousands of Americans to stay at SBM's hotels every year.  North Americans make up the single largest group of SBM clients.  As of September 2000, twenty-two percent of SBM's customers were located in North America.

28.    Apart from Americans who patronize SBM's hotels, thousands more Americans visit Monte Carlo each year.  They stay in Monaco's non-SBM hotels or visit from areas outside of Monaco, arriving from other areas within the Cote d'Azur, French Riviera, Italian Riviera, or the many cruise ships that dock at Monaco's port.

29.    Almost everyone who visits Monaco visits the Casino de Monte-Carlo.  Even non-gamblers visit the casino for its grandiose architecture and art.  Visitors to the casino who are not SBM hotel guests must pay the ten Euro entry fee.

30.    As a result of SBM's long participation and leadership in the international gaming and resort industry, extensive advertising, and media attention over the MONTE-CARLO mark for casino-related services and products, SBM will be irreparably harmed if it loses control over the ability to prevent unauthorized users from using the mark for casino-related products or services.

## DEFENDANTS' UNLAWFUL CONDUCT

31.    During the 1990's, more than a century after SBM created the Casino de Monte-Carlo, and decades after the Casino de Monte-Carlo became a well known brand for casino and related services in the United States, the Monte Carlo Resort & Casino Las Vegas ("Monte Carlo Resort & Casino"), owned and operated by Defendants, opened in Las Vegas, Nevada.

Defendants' Monte Carlo Resort & Casino features a full-service casino offering table games, machine games, a poker room, and a sports book.

32.    Upon information and belief, Defendants selected the term "Monte Carlo" in connection with their resort and casino in order to suggest the opulence, elegance, sophistication, and class customers would encounter were they to visit the real Casino de Monte-Carlo of SBM, so as to confuse and mislead the public and create a false association between their casino and Plaintiff's.

33.    To promote their establishment, Defendants operate a web site located at <http://www.monte-carlo.com>, which has featured on its home page a slogan calculated to suggest an affiliation with SBM's Casino de Monte-Carlo in Monaco: "All the charms of the Mediterranean well within reach."  (See the home page of Defendants' web site, attached hereto as Exhibit C.)

34.    Defendant MGM Mirage also operates a website at <http://www.mgmmirage.com>, which boasts that the "The Monte Carlo features the elegance of a European playground … [including] [c]rystal chandeliers, imported marble and sculptured fountains… ."
(See <http://www.mgmmirage.com/bf/default.aspx?pid=mch&kbid=31851&sub=1476460>, attached hereto as Exhibit D.)

35.    Upon information and belief, Defendants further designed and decorated their resort and casino so as to resemble the real Casino de Monte-Carlo, complete with an art-nouvelle façade, grand arches, fountains, large romance-based statuary, polished marble, fine inlaid woods, painted ceilings, elaborate chandeliers, cobblestone and brick-village square, and

other subtle visual esthetic touches, so as to confuse and mislead the public and create a false association between its casino and Plaintiff's.

36.    Indeed, Defendants have admitted as much by asserting before the United States Patent and Trademark Office ("USPTO") that "Monte Carlo is suggestive of sophisticated gaming, that is the image that most people have in their minds, and that is the image which the [Defendants] sought to identify by creating its Monte Carlo themed Resort/Hotel/Casino." (See Defendants' June 10, 1998 Response to Office Action, attached hereto as Exhibit E, at 11.)

37.    Defendants have further admitted to the USPTO that their intention in using the term "Monte Carlo" was to enable consumers "to experience the façade of [a] world-renown destination[]" and that it "has built a hotel casino that evokes the fantasy of being in a foreign land – Monte Carlo." (See Defendants' March 26, 2002 Response to Office Action, attached hereto as Exhibit F, at 5, 7.)

38.    Upon information and belief, such actions were taken in bad faith with full knowledge of Plaintiff's ownership of and exclusive rights in the MONTE CARLO mark, with the intent to deceive and mislead the public into believing that Defendants' resort and casino is sponsored, licensed, or authorized by or affiliated, connected, or otherwise associated with SBM.

39.    Defendants' use of "Monte Carlo" is likely to cause consumer confusion or mistake or deceive consumers into thinking that Defendants' resort and casino is authorized by or affiliated, connected, or otherwise associated with SBM. Defendants intentionally, willfully, and in bad faith created this misimpression.

40.    Defendants' continued use of the term "Monte Carlo" and their activities in connection therewith are likely to diminish, blur, and/or tarnish the meaning of Plaintiff's famous CASINO DE MONTE-CARLO mark, thereby diluting its distinctive quality.

41.    Incredibly, within the past year, Defendants have begun to assert that they have superior rights over SBM in the MONTE CARLO brand for casino and hotel services.  On December 19, 2007, Defendant Victoria Partners filed an opposition proceeding before the Trademark Trial and Appeal Board of the USPTO, alleging, _inter alia_, likely confusion resulting from SBM's registration of its trademark MONTE-CARLO BAY HOTEL & RESORT.

42.    On December 20, 2007, in a telephonic voice-mail message left for one of SBM's attorneys by one of Defendant Victoria Partners' attorneys, Defendant Victoria Partners threatened to file a cancellation proceeding against an unidentified registration owned by SBM.

43.    On February 5, 2008, in a letter to SBM, a redacted copy of which is attached hereto as Exhibit G, Defendant Victoria Partners intimated that it might bring its own trademark-infringement claims against SBM.

44.    On January 25, 2008, the Defendants' resort and casino caught on fire, raising SBM's concerns.  Viewers watched live on CNN and other news networks as the large "Monte Carlo" sign atop the resort was literally tarnished and consumed by black smoke and fire.



45.    This image and other similar video feeds and still photographs were seen worldwide.  Defendants shut down their hotel and casino.  However, twenty-one days later, the establishment not only reopened, but Defendants continued to call it the "Monte Carlo," despite the associations generated by the fire.

46.    Defendants' activities have caused and will continue to cause Plaintiff great and irreparable harm and damage.  Unless permanently restrained and enjoined by this Court, Defendants will persist in its unlawful activities, thereby causing further damage and irreparable harm to Plaintiff and to the public interest.

47.    Plaintiff has no adequate remedy at law.

## COUNT I — FEDERAL UNFAIR COMPETITION

48.    Plaintiff hereby realleges and incorporates by reference the allegations of paragraphs 1 through 47 of this Complaint.

49.    The aforesaid acts of Defendants constitute use in commerce of words, terms, names, symbols, and devices, and combinations thereof; false designations of origin; false and misleading descriptions of fact; and false and misleading representations of fact that is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants with Plaintiff, or as to the origin, sponsorship, or approval of Defendants' services, goods, or other commercial activities by Plaintiff.

50.    The aforesaid acts of Defendants constitute use in commerce of words, terms, names, symbols, and devices, and combinations thereof; false designations of origin; false and misleading descriptions of fact; and false and misleading representations of fact in commercial advertising, or promotion that misrepresents the nature, characteristics, or qualities of

Defendants' services, goods, or other commercial activities.

51.    The aforesaid acts of Defendants constitute false designation of origin and false and misleading descriptions and representations in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

52.    The aforesaid acts of Defendants have been intentional, willful, and in bad faith.

53.    The aforesaid acts of Defendants have caused, and are causing, great and irreparable harm to Plaintiff, and unless permanently restrained by this Court, said irreparable injury will continue.

## COUNT II —FEDERAL TRADEMARK INFRINGEMENT

54.    Plaintiff hereby realleges and incorporates by reference the allegations of paragraphs 1 through 53 of this Complaint.

55.    Defendants, without the consent of Plaintiff, have used and will continue to use in commerce marks confusingly similar to SBM's CASINO DE MONTE-CARLO trademark in connection with the sale, offering for sale, distribution and advertising of goods and/or services with which such intended use is likely to cause confusion, or to cause mistake, or to deceive.

56.    The aforesaid acts of Defendants constitute trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

57.    The aforesaid acts of Defendants have been intentional, willful, and in bad faith.

58.    The aforesaid acts of Defendants have caused, and are causing, great and irreparable harm to Plaintiff and, unless permanently restrained by this Court, said irreparable injury will continue.

## COUNT III - FEDERAL TRADEMARK DILUTION

59.     Plaintiff hereby realleges and incorporates by reference the allegations of paragraph 1 through 58 of this Complaint.

60.     The aforesaid acts of Defendants have caused and will continue to cause dilution of the distinctive quality of Plaintiff's CASINO DE MONTE-CARLO trademark.

61.     The aforesaid acts of Defendants constitute federal trademark dilution in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

62.     The aforesaid acts of Defendants have been intentional, willful, and in bad faith.

63.     The aforesaid acts of Defendants have caused, and are causing, great and irreparable harm to Plaintiff and, unless permanently restrained by this Court, said irreparable injury will continue.

## COUNT IV — FEDERAL CYBERSQUATTING

64.     Plaintiff hereby realleges and incorporates by reference the allegations of paragraphs 1 through 63 of this Second Amended Complaint.

65.     The aforesaid acts of Defendants constitute the registration, maintenance, and use of domain names (the "MONTE CARLO Domain Names") that are virtually identical to, confusingly similar to, and dilutive of SBM's famous CASINO DE MONTE-CARLO mark, knowingly and with a bad-faith intent to profit therefrom.

66.     The aforesaid acts of Defendants constitute unlawful cybersquatting in violation of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(1).

The aforesaid acts of Defendants have caused, and are causing, great and irreparable harm to Plaintiff, and unless permanently restrained by this Court, said irreparable injury will continue.

## COUNT V — DECEPTIVE ACTS AND
## PRACTICES UNDER NEW YORK LAW

67.     Plaintiff hereby realleges and incorporates by reference the allegations of paragraphs 1 through 66 of this Complaint.

68.     The aforesaid acts of Defendants constitute deceptive acts or practices in the conduct of business, trade, or commerce, or in the furnishing of any service in New York State in violation of Section 349(h) of the New York General Business Law.

69.     The aforesaid acts of Defendants have caused, and are causing, great and irreparable harm to Plaintiff, and unless permanently restrained by this Court, said irreparable injury will continue.

## COUNT VI — FALSE ADVERTISING UNDER NEW YORK LAW

70.     Plaintiff hereby realleges and incorporates by reference the allegations of paragraphs 1 through 69 of this Complaint.

71.     Defendants misleadingly advertised services, in that Defendants made statements, used words, designs, devices, sounds, or combinations thereof that failed to reveal facts material in the light of such representations with respect to the subject service, or under such conditions as are customary or usual.

72.     The aforesaid acts of Defendants constitute false advertising in the conduct of business, trade, or commerce, or in the furnishing of any service in New York State in violation of Section 350-e(3) of the New York General Business Law.

73.     The aforesaid acts of Defendants have caused, and are causing, great and irreparable harm to Plaintiff, and unless permanently restrained by this Court, said irreparable injury will continue.

## COUNT VII — INJURY TO BUSINESS
## REPUTATION AND DILUTION UNDER NEW YORK LAW

74.     Plaintiff hereby realleges and incorporates by reference the allegations of paragraphs 1 through 73 of this Complaint.

75.     The aforesaid acts of Defendants constitute intended use beginning after the CASINO DE MONTE-CARLO mark had become famous and will dilute the distinctive quality of the CASINO DE MONTE-CARLO mark.

76.     The aforesaid acts of Defendants are likely to injure the business reputation of Plaintiff and to dilute the distinctive quality of Plaintiff's trademarks in violation of 360-*l* of the New York General Business Law.

77.     The aforesaid acts of Defendants have caused, and are causing, great and irreparable harm to Plaintiff, and unless permanently restrained by this Court, said irreparable injury will continue.

## COUNT VIII — COMMON LAW TRADEMARK INFRINGEMENT

78.     Plaintiff hereby realleges and incorporates by reference the allegations of paragraphs 1 through 77 of this Complaint.

79.     The aforesaid acts of Defendants constitute use that is likely to cause confusion as to the source of Defendants' goods and/or services.

80.     The aforesaid acts of Defendants constitute trademark infringement in violation of common law.

81.     The aforesaid acts of Defendants have caused, and are causing, great and irreparable harm to Plaintiff, and unless permanently restrained by this Court, said irreparable injury will continue.

## COUNT IX — COMMON LAW UNFAIR COMPETITION

82.    Plaintiff hereby realleges and incorporates by reference the allegations of paragraphs 1 through 81 of this Complaint.

83.    The aforesaid acts of Defendants constitute use that is likely to cause confusion as to the source of Defendants' goods and/or services.

84.    The aforesaid acts of Defendants constitute unfair competition, including misappropriation and palming off, in violation of common law.

85.    The aforesaid acts of Defendants have caused, and are causing, great and irreparable harm to Plaintiff, and unless permanently restrained by this Court, said irreparable injury will continue.

## RELIEF REQUESTED

WHEREFORE, Plaintiff prays for a judgment in its favor and against Defendants ordering:

a.    That Defendants, and each of its officers, directors, agents, servants, employees and representatives, and those persons in active concert or participation with them or any of them, be permanently enjoined and restrained from:

(1)    Using on or in connection with the promotion, advertisement, marketing, sales, offering, or operation of, or in any manner related to gaming or gambling services the term "Monte Carlo," or any colorable imitations thereof or anything confusingly similar thereto;

(2)    Representing by any means whatsoever, directly or indirectly, or doing any other acts or things calculated or likely to cause confusion, mistake, or to deceive consumers into believing that Defendants' goods and/or services are the services or products of Plaintiff, or that there is any affiliation or connection between Plaintiff or its

services and goods and Defendants or their services and products and from otherwise unfairly competing with Plaintiff;

   (3) Registering, using or transferring the MONTE CARLO Domain Names and from registering, using, copying, reproducing or imitating the CASINO DE MONTE-CARLO mark, or any colorable imitations thereof or anything confusingly similar thereto;

   (4) Using any mark in a manner so as to cause the dilution of the distinctive quality of the famous CASINO DE MONTE-CARLO mark;

   (5) Using any designation incorporating the designation MONTE CARLO for casino-related products or services.

  b. That Defendants be directed to file with this Court and to serve upon Plaintiff within thirty (30) days after service upon Defendants of this Court's injunction issued in this action, a written report by Defendants under oath setting forth in detail the manner in which Defendants have complied with this injunction.

  c. That Defendants order the MONTE CARLO Domain Names to be transferred to Plaintiff.

  d. That Plaintiff recover its damages sustained as a result of Defendants' federal trademark infringement, unfair competition, and cybersquatting, together with an accounting of Defendants' profits arising from such activities, and that the Court exercise its discretion and enter a judgment for such additional sums as the Court shall find to be just, according to the egregious nature of the acts of Defendants.

  e. That Plaintiff have and recover treble damages under 15 U.S.C. § 1117 by reason of the willful and deliberate acts of federal trademark infringement by Defendants.

f.      That Plaintiff have and recover treble damages under New York General Business Law §§ 349(h) and 350-d by reason of Defendants' acts of deceptive trade practices.

g.      That Plaintiff have and recover its reasonable attorneys' fees pursuant to 15 U.S.C. § 1117 and New York General Business Law §§ 349(h) and 350-d.

h.      That Plaintiff have and recover Defendants' profits and/or damages by reason of Defendants' acts of trademark infringement and unfair competition under common law.

i.      That Defendants be required to recall from any and all channels of trade any and all advertising or promotional materials or other infringing matter, and to take affirmative steps to dispel any false suggestion of a connection to Plaintiff by virtue of its infringing activities, including, but not limited to, all necessary and appropriate corrective advertising measures.

j.      That Plaintiff have and recover its taxable costs and disbursements herein.

k.      That Plaintiff have such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a jury trial on all issues triable to a jury.

DATED:    New York, New York
          April 1, 2008

QUINN EMANUEL URQUHART OLIVER &
HEDGES, LLP

By: _____
    Robert L. Raskopf
    robertraskopf@quinnemanuel.com
    Claudia T. Bogdanos
    claudiabogdanos@quinnemanuel.com
    Jonathan A. Scharf
    jonathanscharf@quinnemaneul.com

51 Madison Avenue, 22nd Floor
New York, New York  10010
Tel:  (212) 849-7000
Fax:  (212) 849-7100

ATTORNEYS FOR SOCIETE DES BAINS DE
MER ET DU CERCLE DES ETRANGERS A
MONACO

*Of Counsel*:

QUINN EMANUEL URQUHART OLIVER
& HEDGES, LLP
George R. Hedges
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Tel:  (213) 443-3000
Fax:  (213) 443-3100

# EXHIBIT A

25 mai 1866

# Cahier des Charges

relatif à l'exploitation du privilège concédé
par ordonnance du 2 Avril 1863.

# Cahier des Charges,

## relatif à l'exploitation du privilège

### Concédé par Ordonnance du 2 avril 1863.

---

### Article 1er.

La Société s'engage à entretenir dans la Principauté, au lieu dit : Les Spélugues, qui à l'avenir prendra le nom de **Monte Carlo**, l'établissement y existant sous le nom de **Cercle des Étrangers.**

### Article 2.

La Société devra maintenir sur le territoire de **Monaco** l'établissement de **Bains de Mer** y existant, sans néanmoins qu'elle puisse mettre obstacle aux bains de toute nature, ceux de mer exceptés, qui pourraient être établis tant à l'intérieur qu'à l'extérieur de la ville.

### Article 3.

La Société devra entretenir l'usine à **Gaz** établie sur le terrain qui lui a été gratuitement concédé par le gouvernement de **Son Altesse Sérénissime** au lieu du fort **Antoine.**

## Article 4.

*Par convention en date du 12 Mai 1869 entre Son Excellence le Gouverneur Gén. et Monsieur Français Blanc. Son Altesse Sérénissime a renoncé en droit de la Son Stipulé à l'article ci-contre, lequel demeure sans avenu. signé: B. Ed. Imberty. et F. Blanc.*

À l'expiration du Privilège de concession Son Altesse Sérénissime le Prince de Monaco deviendra propriétaire des Établissements désignés aux Articles 1, 2 et 3 ci-dessus, ainsi que de tout le matériel et mobilier meublant les garnissant et dont l'inventaire sera renouvelé le 1er janvier de chaque année.

## Article 5.

La société devra établir dans la Ville de Mona. avant le 1er Septembre 1868, une fontaine d'eau jaillissante qui alimentera 3 bornes fontaines d'une manière suffisante aux besoins de la population.

Cette fontaine, ainsi que les bornes fontaines dont le plan et l'emplacement auront été approuvés par l'autorité, deviendront immédiatement propriété de l'État, avec leurs réservoirs, tuyaux et autres accessoires. La société pourra également exécuter les travaux nécessaires pour fournir, moyennant rétribution, de l'eau aux particuliers.

## Article 6.

La Société devra alimenter à ses frais les becs de gaz posés dans le Palais et la ville de Monaco, ainsi que les autres becs placés hors la ville.

La Société pourra fournir du gaz aux particuliers aux conditions du cahier des charges actuellement en

# EXHIBIT B

**Schedule C**

**SOVEREIGN ORDER**

*Sovereign Order no. 15.732 of March 13, 2003, renewing the gaming monopoly granted to the Société des Bains de Mer et du Cercle des Etrangers à Monaco and approving the terms and conditions and related agreements appended thereto.*

**RAINIER III**
**By the Grace of God**
**Sovereign Prince of Monaco**

In view of the deliberation of the Government Council of November 21, 2002 which was communicated to us by Our Minister of State;

**Have Ordered and Order:**

ARTICLE 1

The gaming monopoly, granted to the Société des Bains de Mer et du Cercle des Etrangers for the first time on April 2, 1863, is hereby renewed for twenty years, as of April 1, 2007.

ART. 2

Are hereby approved the terms and conditions and the related agreements concluded on March 21, 2003 between Our Public Lands Administration, Mr. Jean-Luc BIAMONTI, President of the Société des Bains de Mer et du Cercle des Etrangers, and Mr. Bernard LAMBERT, CEO of the Société des Bains de Mer et du Cercle des Etrangers.

ART. 3

Our Secretary of State, Our Director of Legal Services and Our Minister of State are, each of them insofar as he is concerned, in charge of the enforcement of the present order.

Given in Our Palace in Monaco, on March 13, 2003.

RAINIER.

*By the Prince,*
*The Secretary of State:*
R. NOVELLA

DE GAULLE FLEURANCE & ASSOCIES
SOCIETE D'AVOCATS
I I, RUE PORTALIS
75008 PARIS
TEL : 01 56 64 00 00
FAX : 01 56 64 00 01

*Arrêté Municipal n° 2003-26 du 19 mars 2003 prononçant l'admission à la retraite anticipée d'un fonctionnaire (p. 668).*

### AVIS ET COMMUNIQUÉS

#### MINISTÈRE D'ÉTAT

Secrétariat Général.

*Modification de l'heure légale - Année 2003 (p. 668).*

Direction de la Fonction Publique et des Ressources Humaines.

*Avis de recrutement n° 2003-32 d'une Gouvernante chargée de la Résidence Archiépiscopale (p. 668).*

*Avis de recrutement n° 2003-37 d'un Cuisinier au Mess de la Force Publique (p. 669).*

*Avis de recrutement n° 2003-38 d'un Ouvrier électromécanicien au Service de l'Aménagement Urbain (p. 669).*

*Avis de recrutement n° 2003-39 d'un Jardinier aide-ouvrier professionnel au Service de l'Aménagement Urbain (p. 669).*

*Avis de recrutement n° 2003-40 d'un Conseiller Technique au Service d'Information et de Contrôle sur les Circuits Financiers (p. 669).*

#### DÉPARTEMENT DES FINANCES ET DE L'ÉCONOMIE

Office des Émissions de Timbres-Poste.

*Mises en vente de timbres commémoratifs (p. 670).*

#### MAIRIE

*Convocation du Conseil Communal - Session extraordinaire - Séance publique du mardi 1er avril 2003 (p. 670).*

*Avis de vacance n° 2003-034 d'un poste de Chef de service au Service de Gestion des Personnels (p. 670).*

*Avis de vacance n° 2003-038 de trois postes de Surveillants de Jardins saisonniers à la Police Municipale (p. 671).*

*Avis de vacance n° 2003-039 de trois postes de Surveillants de Jardins saisonniers à la Police Municipale (p. 671).*

*Avis de vacance n° 2003-040 d'un poste de Surveillant de Jardins saisonnier à la Police Municipale (p. 671).*

#### INFORMATIONS (p. 671).

#### INSERTIONS LÉGALES ET ANNONCES (p. 672 à p. 686).

### DÉCISION SOUVERAINE

*Erratum à la Décision Souveraine du 27 mai 2002 publiée au "Journal de Monaco" du 14 juin 2002 relative à la nomination des membres de la Commission Consultative de la Collection Philatélique de S.A.S. le Prince Souverain.*

Lire page 971 :

..................................................................................

Le second paragraphe est modifié comme suit :

Sont nommés Membres de ladite Commission les personnes suivantes :

..................................................................................

Le reste sans changement.

### ORDONNANCES SOUVERAINES

*Ordonnance Souveraine n° 15.732 du 13 mars 2003 renouvelant le privilège des jeux concédé à la Société des Bains de Mer et du Cercle des Etrangers à Monaco et approuvant le cahier des charges et les conventions annexes afférents.*

#### RAINIER III
#### PAR LA GRACE DE DIEU
#### PRINCE SOUVERAIN DE MONACO

Vu la délibération du Conseil de Gouvernement en date du 21 novembre 2002 qui Nous a été communiquée par Notre Ministre d'Etat ;

#### Avons Ordonné et Ordonnons :

#### ARTICLE PREMIER.

Le privilège des jeux, octroyé à la Société des Bains de Mer et du Cercle des Etrangers pour la première fois le 2 avril 1863, est renouvelé pour vingt années, à compter du 1er avril 2007.

#### ART. 2.

Sont approuvés le cahier des charges et les conventions annexes intervenus le 21 mars 2003 entre Notre Administration des Domaines, M. Jean-Luc BIAMONTI, Président de la Société des Bains de Mer et du Cercle des Etrangers, et M. Bernard LAMBERT,

Directeur Général de la Société des Bains de Mer et du Cercle des Etrangers.

### ART. 3.

Notre Secrétaire d'Etat, Notre Directeur des Services Judiciaires et Notre Ministre d'Etat sont chargés, chacun en ce qui le concerne, de l'exécution de la présente ordonnance.

Donné en Notre Palais à Monaco, le treize mars deux mille trois.

RAINIER.

*Par le Prince,*
*Le Secrétaire d'État :*
R. NOVELLA.

---

*Ordonnance Souveraine n° 15.737 du 18 mars 2003 portant naturalisation monégasque.*

### RAINIER III
### PAR LA GRACE DE DIEU
### PRINCE SOUVERAIN DE MONACO

Vu la requête qui Nous a été présentée par le Sieur Alain, Louis, Germain BAUBRIT, tendant à son admission parmi Nos sujets ;

Vu la Constitution ;

Vu la loi n° 1.155 du 18 décembre 1992, modifiée par la loi n° 1.199 du 26 décembre 1997, et notamment les articles 5 et 13 ;

Vu l'article 25 § 2 de l'ordonnance organique du 9 mars 1918 ;

Vu Notre ordonnance n° 403 du 15 mai 1951, modifiée ;

Sur le rapport de Notre Directeur des Services Judiciaires ;

Notre Conseil de la Couronne entendu lors de sa séance du 11 juin 2002 ;

Avons Ordonné et Ordonnons :

Le Sieur Alain, Louis, Germain BAUBRIT, né le 31 octobre 1955 à Nantes (Loire-Atlantique), est naturalisé monégasque.

---

Il sera tenu et réputé comme tel et jouira de tous les droits et prérogatives attachés à cette qualité, dans les conditions prévues par l'article 13 de la loi n° 1.155 du 18 décembre 1992, modifiée.

Notre Secrétaire d'Etat, Notre Directeur des Services Judiciaires et Notre Ministre d'Etat sont chargés, chacun en ce qui le concerne, de l'exécution de la présente ordonnance.

Donné en Notre Palais à Monaco, le dix-huit mars deux mille trois.

RAINIER.

*Par le Prince,*
*Le Secrétaire d'État :*
R. NOVELLA.

---

*Ordonnance Souveraine n° 15.738 du 18 mars 2003 portant naturalisations monégasques.*

### RAINIER III
### PAR LA GRACE DE DIEU
### PRINCE SOUVERAIN DE MONACO

Vu les requêtes qui Nous ont été présentées par le Sieur Guy, Pierre, François BOSCAGLI et la Dame Lucile, Angèle, Joséphine GRAC, son épouse, tendant à leur admission parmi Nos sujets ;

Vu la Constitution ;

Vu la loi n° 1.155 du 18 décembre 1992, modifiée par la loi n° 1.199 du 26 décembre 1997, et notamment les articles 5, 6 et 13 ;

Vu l'article 25 § 2 de l'ordonnance organique du 9 mars 1918 ;

Vu Notre ordonnance n° 403 du 15 mai 1951, modifiée ;

Sur le rapport de Notre Directeur des Services Judiciaires ;

Notre Conseil de la Couronne entendu lors de sa séance du 16 avril 2002 ;

Avons Ordonné et Ordonnons :

Le Sieur Guy, Pierre, François BOSCAGLI, né le 24 octobre 1955 à Monaco et la Dame Lucile, Angèle,

# EXHIBIT C

Page 2 sur 3

Monte Carlo Las Vegas Resort Hotel and Casino



http://www.monte-carlo.com/intro-flash.php3

# EXHIBIT D

Las Vegas Hotels, Las Vegas Shows, Las Vegas Restaurants



las vegas

Sign up for special Las Vegas offers, event announcements, night club and restaurant openings via MGM MIRAGE RSS Feeds!

featured HOTEL





Monte Carlo
RESORT & CASINO

The Monte Carlo features the elegance of a European playground combined with the excitement of Las Vegas. Crystal chandeliers, imported marble and sculptured fountains rival the most magnificent destination resorts in the world.

AVAILABILITY

| Arrival Date | | Nights | Adults | Children |
|---|---|---|---|---|
| March 2008 | 27 | 1 | 1 | 1 |



SEARCH ▶

more CHOICES    the perfect PLACE



RESTAURANTS

SHOWS

http://www.mgmmirage.com/bf/default.aspx?pid+mcm&kbid=318551&sub=1476460

Las Vegas Hotels, Las Vegas Shows, Las Vegas Restaurants



Premier shows, live concerts, and fine restaurants only at MGM Grand.

THEhotel is the perfect compliment to an impressive property.

Monte Carlo is a European playground in Las Vegas. From $89.95/nt

KA
MGM Grand

Mystere
Treasure Island

Fantasy
Luxor

Lance Burton
Monte Carlo

Danny Gans
The Mirage

Mamma Mia
Mandalay Bay

Restrictions may apply. Please see individual property websites for details, terms and conditions of these offers.
Copyright © 2006 MGM MIRAGE. All rights reserved.



# EXHIBIT E

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| APPLICANT: | Victoria Partners | ) | Law Office 101 |
| | | ) | |
| Serial No.: | 75/307499 | ) | Trademark Attorney |
| | | ) | Robert L. Lorenzo |
| | | ) | |
| Filed: | June 9, 1997 | ) | |
| | | ) | |
| MARK: | MONTE CARLO | ) | INT. CLASS 42 |

Assistant Commissioner for Trademarks
BOX 5 / LAW OFFICE 101
2900 Crystal Drive
Arlington, VA 22202-3513

### RESPONSE TO OFFICE ACTION DATED DECEMBER 10, 1997

Dear Mr. Lorenzo:

This communication is in response to the Office Action dated December 10, 1997.

Reconsideration is respectfully requested in view of the following amendment, analysis, and

additional information regarding Applicant, Victoria Partners.

I.    **Recitation of Services.** Please enter the following recitation of services into the

record: <u>Providing bar services, featuring, alcoholic malt beverages brewed on the premises, in</u>

<u>International Class 42.</u>

II.    **Summary of the Applicant's Use and the Proper Grounds for Registration of**

**its Monte Carlo mark.** The mark, "Monte Carlo," is used to identify, promote, and advertise the

Applicant's Hotel, Casino, and entertainment services, and, in the present application, the mark is

used to advertise and promote its Pub & Brewery. The Monte Carlo Hotel/Resort/Casino is

located on the world-famous Las Vegas strip. Possessing some 3,000 rooms, the Resort is one of

H:\CLIENTS\MONCAR\OPACTIN2.rsp

the world's largest Hotels. It joins many other Las Vegas resorts in identifying and promoting itself to the consuming public thematically. The entire Hotel/Casino/Resort is an artistic and architectural fantasy, consisting of a series of designs which fancifully and tastefully conjures up in the minds of the public a sense of opulence, elegance and sophistication of European gambling and royalty.

Contrary to the examiner's contention that the mark is merely primarily geographically descriptive, the Applicant respectfully submits that the mark is in fact suggestive, and, therefore, is capable of registration. In thousands of locations across the United States, charities, churches, and eleemosynary organizations hold "Monte Carlo" nights. Patrons dress in tuxedos and gowns, and gather to engage in games of chance for a worthwhile cause. For them, and the public at large, the term "Monte Carlo" is not primarily merely a geographic location, it is suggestive of an elegant style, an attitude of class, and an activity of gambling. Since most people have not personally visited Monaco on the French Riviera and are not acquainted with the actual city of Monte Carlo, the public's conception of the place is in part created by the image that has been portrayed in many films, such as Carey Grant's To Catch a Thief, or the James Bond films, such as Golden Eye. For the Applicant and its customers, "Monte Carlo" is more than a place, it is a term that suggests opulence, elegance, and sophistication in games of chance.

It is precisely for this reason that Applicant's mark is also not primarily deceptively misdescriptive, since the word conjures up a sense of elegance and sophistication, "Monte Carlo" nights does not mislead the public into believing that they are somehow transported to the country of Monaco. No, indeed, people in towns, cities, and suburbs across America know clearly where they are at when they go to a "Monte Carlo" night, just as people who travel to Las Vegas,

Nevada, arguably this countries most well publicized destination resorts, know full-well when they

get here that they are in a city dedicated to fun, entertainment, relaxation, and gaming.

Moreover, Las Vegas visitors are familiar with visiting theme-based properties and

recognized those theme-based properties as such. Themed resorts are common in Las Vegas.

For example, the Luxor Hotel & Casino is the namesake of the Egyptian city of Luxor, which was

an important city of the Pharoahs 3,000 years ago, and is a contemporary metropolis in Egypt

today. New York New York Hotel & Casino is a 49-story tall hotel, casino, and resort in Las

Vegas that is themed on the world's greatest city during its hay-day of the 1940's and 1950's.

Currently under construction and about to open in Las Vegas are two additional city themed

resorts, Paris and the Venetian. Thus, visitors to Las Vegas have come to recognize and accept

themed resorts, sometimes based upon cities, or sometimes based upon broader themes. For

example, Treasure Island is based upon Carribean Pirates. The Excalibur is based upon the

Arthurian legend, and Caesar's Palace attempts to incorporate all of the spectacle and grandeur of

ancient Rome, another well-known city, and like that mark, Monte Carlo does not merely stand

for the city, it is suggestive of the opulence and splendor of the gaming that took place in that

city, amongst the European nobility, and that is the suggestive theme that is conjured by the mark.

The examiner has also rejected the application for this service mark based upon a

trademark previously registered for beer. The applicant respectfully suggests that the product and

the services are clearly distinguishable in the minds of the public and present no real likelihood of

confusion. The Monte Carlo Pub & Brewery is located within the Monte Carlo Hotel & Casino.

In order to receive the services which it offers, patrons must approach the Monte Carlo's art

nouvelle facade, and view its exterior's orientation from Las Vegas Boulevard, which features

grand arches, fountains, and large romance-based statuary, reminiscent of Europe's finest art. The Hotel's lobby is a grand expanse of polished marble and fine inlaid woods, and the Casino features painted ceilings, elaborate chandeliers, and all the subtle visual esthetic reminders which suggests the Hotel's theme of sophisticated gaming. In the midst of the Hotel is its retail areas, where marble gives way to cobblestone and brick to create the sense of a village square. In the midst of the retail shops, alongside other shops, restaurants, and eating opportunities, is the Monte Carlo's Pub & Brewery. The brewery is designed as a nouveau warehouse, with its 20-foot copper brew vats, prominently displayed through glass walls that look out onto the brick and cobblestone retail area and are visible through to the interior of the restaurant. The restaurant seats some 415 guests, who are surrounded by brewing mechanisms and devices that create the feel and smell of a quality brewing house.

In recent years, micro breweries have become exceedingly popular, as is evidence by the attached articles. Patrons of the Monte Carlo Hotel & Casino who come to the Pub & Brewery clearly recognize where they are at, and surrounded by the large brewing vats, chilling kegs, and dispensers, the patrons clearly recognize that its beverages sold under the trademarks, Jackpot Pale, Winner's Wheat, and High Roller are brewed right there before their eyes, and are the product of the Hotel's Brewery and no-one else's. The beers' Nevada State trademark registrations are attached for the examiner's review.

Therefore, it is respectfully submitted that patrons who encounter the Monte Carlo Pub & Brewery clearly recognize that it is part of the Monte Carlo Hotel/Casino/Resort and that the services they are receiving in terms of food, drinks, and entertainment originate from that source and no other, and it is further respectfully submitted that the consumers who are enjoying a

H:\CLIENTS\MONCAR\OFACTIN2.rsp                4

Jackpot Pale, a Winner's Wheat, or a High Roller will not mistakenly associate in their minds those beers with the cited registrant who produce its products somewhere in Guatemala. Clearly, the recipients of the services for which this registration is sought know both where they are receiving the services, and the source of origin of those services, the Monte Carlo Hotel/Casino/Resort in Las Vegas.

III.    **Background.** The Monte Carlo Hotel & Casino, and the Monte Carlo Pub & Brewery, are owned by Victoria Partners. Victoria Partners was originally a joint venture between Mirage Resorts, International, a Nevada corporation, and Gold Strike L.V., a Nevada general partnership. Circus Circus Enterprises, Inc., a Nevada corporation, bought out Gold Strike and therefore now controls 50% of Victoria Partners. Please find enclosed a diagram listing all of the partners of Gold Strike that are now owned by Circus Circus. Mirage Resorts owns several resort hotels in Las Vegas and one in Biloxi, Mississippi. These include the Mirage, Treasure Island, Golden Nugget, Bellagio, and Beau Rivage. Circus Circus owns several resorts as well in Nevada, Illinois, and Mississippi. These include Circus Circus Las Vegas, Circus Circus Reno, Luxor, Excalibur, Colorado Belle, Edgewater, Silver City, Slots-Of-Fun, Gold Strike, Nevada Landing, Railroad Pass, The Grand Victoria, Silver Legacy, Goldstrike Mississippi, and the Monte Carlo. Victoria Partners is a 50/50 partnership with Circus Circus acting as the manager on behalf of the partnership. The application for registration of the mark "Monte Carlo" in class 42 for bar services was signed by Vince Mathews, who was at the time the Vice President and General Manager of the Monte Carlo Hotel & Casino and, thus, Mr. Mathews was also the General Manager of the Monte Carlo Pub & Brewery. Mr. Mathews is knowledgeable concerning the statements to which he is attesting to in the application for registration and has

H:\CLIENTS\MONCAR\OFACTIN2.rsp                                5

actual authority to act on behalf of Victoria Partners. Please find enclosed an affidavit signed by Michael Ensign, the Operating Manager of Victoria Partners declaring Vince Mathews to have signed the application for registration under color of authority to sign on behalf of the joint venture and with personal knowledge of the facts attested to.

IV. **Rejection.** Registration has been refused on three separate basis':

1. That the mark when used on or in connection with the identified goods, so resembles the mark in U.S. Registration No. 1,211,119 as to be likely to cause confusion, to cause mistake, or to deceive;

2. That if the Monte Carlo services do not originate in Monte Carlo, Monaco the mark is geographically deceptively misdescriptive of applicant's services; and

3. That if the services do originate from the geographical place Monte Carlo, Monaco, the mark is primarily geographically descriptive.

These grounds of rejection will be addressed separately in the following sections of this response.

1. _As used by the Applicant, the mark is not likely to cause confusion with a registered mark for packaged imported beer from Guatemala City, Guatemala._

A. **Registrant's goods and Applicant's services do not have the requisite relatedness as they do not come to the attention of the same type of customers under circumstances suggesting common origin.**

We appreciate the examiner's reference to the case _In re Best Western Family Steak House, Inc.,_ 222 USPQ 827 (TTAB 1984). However, we do not believe it is dispositive. The court in this case agreed with the statement that there is no hard and fast rule that foods and

restaurant services are confusingly similar. Instead the issue is evaluated according to the specific facts involved. The court in <u>Best Western</u> found that the purchasing public could in fact find a connection between applicant's services and registrants goods in that the public could think that registrant's meat could be related to applicant's steakhouse in that they are somehow connected with the same source.

The facts of Victoria Partner's application for registration distinguish the situation from the <u>Best Western</u> case as such to show there is not the requisite likelihood of confusion to the public. As previously noted, the Monte Carlo Pub & Brewery is located inside the Monte Carlo Hotel & Casino. There is no separate entrance to the restaurant. All customers must walk from the Las Vegas strip into and through the Hotel/Casino area to get to the restaurant. Therefore, customers are not at all likely to be confused as to the origin of the services offered by the Monte Carlo Pub & Brewery. They clearly originate from the Monte Carlo Hotel & Casino itself.

One of the primary entertainment attractions and the primary visual and esthetic attraction for the Pub is the fact that it is a micro-brewery. The 20" tall copper beer vats are prominently displayed through glass walls both to passers by and to the guests inside the Pub. There is really no possibility that customers would be confused so as to think the beer is not brewed right on the premises, since that is what the customers are told and shown from the outset. On the other hand, consumers of <u>imported beer</u> are fully aware that their beer is <u>imported</u> from another country outside the U.S. This distinction has a great deal to do with their decision to purchase the beer, as is evidenced from the attached articles about consumer's choice of imported beers.

Consumers in the <u>Best Western</u> case were purchasers of hot dogs and bologna, products which, by there relatively short shelf life, are not commonly imported. Although a consumer

VP-00544

would be aware of the brand of meat purchased in a store, they would not be aware of a brand purchased as part of a meal ordered at a restaurant. Hence, there could be confusion as to source or sponsorship in the <u>Best Western</u> fact pattern.

This confusion is not likely to happen to consumers of the Hotel's services. Beer is typically ordered by brand in a restaurant. A consumer knows exactly which brand he or she is being served and is consuming. In the specific case of the Monte Carlo Pub & Brewery, the beers which the patrons will ask to be served are either, Jackpot Pale, Winner's Wheat, or High Roller. This fact is evidenced by the state trademark registrations which the Hotel obtained for the beers it brews on cite. The consumer is not ordering a Monte Carlo beer, they are ordering a Jackpot Pale, a Winner's Wheat, or a High Roller beer at the Monte Carlo Pub & Brewery in the Monte Carol Resort/Hotel/Casino in Las Vegas. Furthermore, the industry has clearly educated the public on the difference between domestic beer and imported beer as is evidenced by the accompanying articles and reports. It is therefore highly unlikely that anyone ordering a beer brewed on the premises at the Monte Carlo Pub & Brewery would ever think they are going to be served an imported beer from Guatemala or that the Guatemala company has participated in any way in the restaurant services being offered at the Monte Carlo Pub & Brewery.

2.    <u>Applicant's mark is not primarily geographically deceptively misdescriptive.</u>

As has been set forth earlier herein, the Monte Carlo pub is designed as a warehouse in the retail district that could be found in the fantasy city of sophisticated gaming in Monte Carlo. The fact that the name "Monte Carlo" was chosen to create a feel or aura for elegance is merely suggestive. This fact does not lead to the conclusion that customers may believe that the services provided are somehow Monaco-based any more than customers would believe that the Monte

VP-00545

Carlo Hotel & Casino is somehow associated with Monaco. As note previously, customers are very familiar with visiting theme-based properties and recognize them as such. The themed-based resorts in Las Vegas are so numerous that they have now become the dominant casino format in Las Vegas. They include, the Luxor, the Excalibur, New York New York, Paris, Bellagio, Caesar's Palace, Imperial Palace, Venetian, Treasure Island, Frontier, Circus Circus, Riviera, Sahara, and on, and on, and on. If any association is made in the Monte Carlo Pub & Brewery customers' mind, it is the fact that it is located in the Monte Carlo Hotel & Casino and, therefore, must be associated with the Hotel. However, there is no evidence to support the Examining Attorney's conclusion that customers "would falsely believe that the applicant's bar services originate from the Monte Carlo." Customers of the Monte Carlo Hotel & Casino are no more likely to believe that the services originate in Monaco than are the casino guests of New York New York to believe that the craps tables and other gaming services originate in that city, or patrons of the Luxor are likely to believe that the services that they are receiving originate in a Nile River Valley in Egypt.

The mark is in fact a suggestive, non-descriptive use of a geographic term and is therefore registrable. To show that a mark is primarily "geographically deceptive," it must first be primarily deceptively misdescriptive under Section 2(e)(2) of the Lanham Act. In addition, the Federal Circuit has indicated that the PTO must show that the "geographic misrepresentation is material to the decision to purchase the goods so marked." Instit National Des. Appellations D'Origine v. Vinters International Co., 958 F.2d 1574, 22 USPQ 2d 1190, 1195 (Fed. Cir. 1992). While the case law on this subject relates almost exclusively to products, as opposed to services, it may be

VP-00546

presumed that the additional showing by the Federal Circuit would apply to a customer's decision to purchase services as well.

Accordingly, the Office must prove that the mark is geographically deceptively misdescriptive. The mark sought to be registered in this application simply cannot be so characterized. Applicant does not understand how anyone visiting the Pub & Brewery in the Monte Carlo Hotel & Casino in Las Vegas would be led to believe that somehow the services which he enjoys in Las Vegas originate elsewhere, simply because the name of the Pub identifies the theme of the Resort it is located inside of.

3.    Applicant's mark is not geographically descriptive.

The Examining Attorney has postulated that "the primary significance of the term 'Monte Carlo' is geographic, and applicant's bar services originate from the geographical place named in the mark." Additionally, the Examiner stated "if the primary significance of a mark is to indicate a geographic location which is neither obscure nor remote and the applicant's goods are manufactured or produced in the location indicated, then the public is likely to believe that the geographic term identifies the place from which the goods originate." citing In re Nantucket Allserve, Inc., 28 USPQ2d 1144 (TTAB 1993). This is an incorrect assumption. The concept brought to mind by the mark "Monte Carlo" is instead a mythical location of style, elegance, and sophisticated gambling as explained earlier. It is not the actual geographic location in Monte Carlo, Monaco that is being indicated, but rather people's fantasy about what the "aura" of class and feelings the name represents. Additionally since applicant's services do not in fact originate from Monte Carlo, Monaco, the conclusion the Examining Attorney has reached by applying the case law is incorrect. As noted previously, Monte Carlo, for most people, is less about a place

and more about the activity. "Monte Carlo" nights, where people dress in gowns and formal wear to try their hands at games of chance for their favorite charity or church, is not about traveling to a specific location outside of the United States. Monte Carlo is suggestive of sophisticated gaming, that is the image that most people have in their minds, and that is the image which the Applicant sought to identify by creating its Monte Carlo themed Resort/Hotel/Casino. The Applicant sought to convey instantaneously to its potential patrons a sense of elegance and sophistication in a gaming establishment, rather than some of the other creations that the operator of this resort uses. The examiner is reminded that the operating entity that runs the Monte Carlo Hotel is Circus Circus Enterprises. Its other theme-based resorts, such as Circus Circus, based upon a circus theme, Excalibur, based upon the Arthurian legend, and Luxor, based upon ancient Egypt, all portray a very clear distinctive theme, and Monte Carlo was to suggest a theme of sophistication and elegance in gaming in a way that the other resorts do not.

Under the Lanham Act, the U.S. Patent and Trademark Office bears the burden of proving that the mark is unregistrable because it is "primarily geographically descriptive," "deceptively misdescriptive," or "deceptive." Application of Standard Elektrik Lorenz Aktiengesellschaft, 371 F.2d 870, 152 USPQ 563 (CCPA 1967). See also, In re Norfolk Wallpaper Company, Inc., 216 USPQ 903 (TTAB 1983) in which the Board stated: "The recent case of In re Nantucket, Inc., 213 USPQ 889 (CCPA 1982), has made it clear that in the case of a mark challenged on the ground that it is primarily geographically descriptive, the Examining Attorney must establish that the purchasing public would expect the goods recited in their application to have their origin in the geographic place named in the mark. We believe that such a requirement has equal application in the case of a mark challenged as primarily geographically descriptive. . ."

Accordingly, the burden of proof of geographical descriptiveness, or misdescriptiveness, rests with the Patent and Trademark Office. We feel no such proof has been offered, nor does any exist.

Accordingly, withdrawal of the refusal to register based on the ground of geographical descriptiveness is requested.

## CONCLUSION

The mark, as it is used, clearly indicates that the services identified are those of a themed restaurant located in the Monte Carlo Hotel/Casino/Resort in Las Vegas, Nevada. Thus, there is no likelihood of confusion between a trademark for an imported beer from Guatemala, and the services of a restaurant that bears the same name of the Casino/Resort in which it is located. Further, the mark "Monte Carlo" is not primarily geographically deceptively misdescriptive nor primarily geographically descriptive, but rather, it is suggestive of elegant and sophisticated gambling. Accordingly, the applicant requests that the Trademark Attorney pass the mark for publication.

Respectfully Submitted,

QUIRK & TRATOS

Date: 6/10/98

By: _____
Mark G. Tratos, Esq.
3773 Howard Hughes Parkway
Suite 500 North
Las Vegas, Nevada 89109
(702) 792-3773

H:\CLIENTS\MONCAR\OFACTIN2.rsp

· 12

# EXHIBIT F

TRADEMARK

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| Applicant | : | Victoria Partners | ) |
| Serial No. | : | 76/284329 | ) |
| Filed | : | July 12, 2001 | ) |
| Mark | : | MONTE CARLO | ) |
| Examining Attorney | : | Robert L. Lorenzo | ) |
| Law Office | : | 111 | ) |

I Claudia Y. Ferrer, hereby certify that the foregoing documents are being deposited with the United States Postal Service on March 26, 2002, Post Office to Addressee" Mailing Label Number EV 037417658 U.S. addressed to the Assistant Commissioner for Trademark, Trademark Trail and Appeal Board (TTAB), 2900 Crystal Drive, Arlington, VA 22202-3513, on

3/26/05
(Date)
Claudia ____

## RESPONSE TO OFFICE ACTION

Assistant Commissioner of Trademarks
Box Responses
Trademark Law Office 111
ATTN: Robert L. Lorenzo
2900 Crystal Drive
Arlington, VA 22202-3513

Dear Mr. Lorenzo:

In response to the Office Action dated September 27, 2001, the Applicant by and through its attorneys of record submits the following response.

The Examiner has refused registration on the Principal Register contending that the proposed mark, MONTE CARLO, is merely descriptive or geographically deceptively misdescriptive of Applicant's casino services. In response, Applicant respectfully submits that its mark is registrable as it is suggestive of Applicant's services and does not deceptively misrepresent its services.

-1-

Mark         :    MONTE CARLO
Serial No.   :    76/284329

## I.   INFORMALITIES

### 1. REQUIREMENTS FOR AN APPLICATION BASED ON §1(A): USE IN COMMERCE

The date of Applicant's first use of the mark anywhere on or in connection with its identified services is May 1, 1995.  The date of Applicant's first use of the mark in commerce as a trademark or service mark is May 1, 1995.

As requested by the Examiner, Applicant re-submits its specimen showing Applicant's use of its "MONTE CARLO" mark in commerce for casino services in Class 41. Specifically, it is a copy of a brochure depicting Applicant's resort hotel casino, which is where Applicant's services are provided.  The specimen distinctly shows how Applicant uses its MONTE CARLO mark in commerce -- on its casino building, as well as on gaming chips and signage therein.

### 2.  SIGNIFICANCE OF WORDING

The word "MONTE CARLO" has no meaning, foreign translation or significance in the relevant trade or industry, or as applied to the services.

### 3.  NATURE OF THE SERVICES

Applicant's services do not originate from nor are they produced in Monte Carlo. The only significant connection with Monte Carlo is that Applicant operates a theme-based resort hotel casino suggestive of European Monte Carlo.

### 4.  CONCURRENT USE

Registration of the mark is sought for all states of the United States, except

-2-

Mark          :    MONTE CARLO
Serial No.    :    76/284329

Montana. Based upon information and belief, a local business, located at Post Office Box 20711, Billings, Montana, 59104, operates a gambling establishment under the "MONTE CARLO" name. The gambling business is limited to the play of certain types of gaming machines, specifically, poker and keno.

In accordance with TMEP 1207.04(d)(i), a concurrent use agreement is not required. This section states that "the owner of the relevant application or registration must consent to the grant of a concurrent registration to the applicant" _or_ "the applicant's date of first use of the mark in commerce must be prior to the earliest of the filing dates of the pending applications or of any registration issued under the Trademark Act of 1946." The section goes on to specify that "[w]here a party specified as an excepted user does not own an application or registration of the mark, the date of first use in commerce claimed by the applicant is obviously prior to the filing date of any application to register the mark which may thereafter be filed by such excepted user."

As the excepted user in this case does not have an application or registration of its MONTE CARLO mark, Applicant's date of first use of the mark in commerce is necessarily before any application or registration of the excepted party. Accordingly, Applicant is not required to have a concurrent use agreement. The excepted user need not be part of the Applicant's concurrent use process.

Applicant submits the following concurrent use statement to be printed in the Official Gazette:

"Subject to Concurrent Use Proceeding with an unnamed business located at

-3-

Mark        :    MONTE CARLO
Serial No.  :    76/284329

Post Office Box 20711, Billings, Montana, 59104.

Applicant claims exclusive right to use the mark in the area comprising all the states of the United States, except for Montana."

5.  NAMES AND CITIZENSHIP OF PARTNERS OMITTED

Applicant, Victoria Partners, is a Nevada joint venture, whose managing partner is Mandalay Resort Group, a Nevada corporation.

6.  PRIOR PENDING APPLICATIONS

Applicant reserves the right to respond to Examiner's cited pending Application Serial Nos. 76/158955 and 76/223719 until a later date.

## II. BACKGROUND

In the past decade, the Las Vegas "Strip" has undergone an incredible revolution. As the Strip has extended South with new casino resorts being built in greater and greater capacity, competition has spawned a new phase of creativity in the resort casino business. This phenomenon is typified by the use of themes for casino resorts. The names of the casino resorts are used to bolster the theme of the property. As these theme-type resort hotel casinos have proliferated on the Strip, there has come to be an expectation by the consumers that they can come to Las Vegas to indulge in the fantasy of being in another time or another place.

Examples of such themed resort projects include Caesar's Palace, a themed resort designed to suggest the opulence and grandeur of ancient Rome; Treasure Island, a

-4-

Mark      :    MONTE CARLO
Serial No. :    76/284329

themed property designed to celebrate the pirate mystique and to remind patrons of the swashbuckling adventures which have been celebrated in literature, plays and films; the Luxor, an Egyptian-themed hotel casino resort that features contemporary renditions of the monuments which constituted many of the Eight Wonders of the World; and New York New York, a resort casino intended to convey the mystique of the world's greatest metropolitan center in its historic heyday of the 1940s and 1950s.

As with any business, Applicant must stay competitive as the Strip grows and casino resorts are added. In order to compete in this theme-resort market, Applicant has built a hotel casino that evokes the fantasy of being in a foreign land—Monte Carlo. Monte Carlo fits into the modern day Las Vegas theme approach for resort hotel casinos that consumers have come to expect.

## III. DISCUSSION

### A. APPLICANT'S MARK IS NOT PRIMARILY GEOGRAPHICALLY DECEPTIVELY MISDESCRIPTIVE

**1. Applicant's mark is not primarily geographically deceptively misdescriptive because consumers are unlikely to be mistaken.**

The test to determine whether a mark is primarily geographically deceptively misdescriptive under Section 2(e)(3) is twofold. See In re Loew's Theatres, 226 U.S.P.Q. 865, 867 (Fed. Cir. 1985). The first part of the test is whether the name is a generally known geographic place. Loew's, 226 U.S.P.Q. at 867. Applicant concedes that Monte Carlo is the name of a country. But, the second part of the test for primarily geographically deceptively misdescriptiveness is that the mark must be misdescriptive "as applied to the

-5-

Mark          :     MONTE CARLO
Serial No.    :     76/284329

goods of the applicant." <u>Loew's</u>, 226 U. S.P.Q. at 867.  To show that the mark is

misdescriptive as applied to the goods, the Examiner must demonstrate that the mark is

used in a "primarily" geographic manner. <u>Loew's</u>, 226 U.S. P.Q. at 867.  The Examiner

proves this by establishing a goods/place association. <u>Bernier</u>, 13 U.S.P.Q.2d at 1726.

Furthermore, "the burden is on the Examining Attorney to submit sufficient evidence to

establish that the term sought to be registered falls within the proscription of the statute."

<u>In re Budge Mfg. Co., Inc.</u>, 8 USPQ 2d 1259, 1260 (Fed. Cir. 1988).

   MONTE CARLO is not primarily geographically deceptively misdescriptive because

Applicant's use of the term "Monte Carlo" is not primarily geographical as applied to the

mark's use on Applicant's <u>services</u>.  First, the underlying use of MONTE CARLO is as an

arbitrary or suggestive designation on a casino resort.  The resort is not in Monte Carlo.

Rather, it is in Las Vegas, Nevada -- a desert in the United States.  Consumers will not

believe that they are in Monte Carlo while at Applicant's resort. Rather, the use of "MONTE

CARLO" in the mark is merely used to suggest images of European style.

   Indeed, this type of resort hotel casino theme is typical of Las Vegas. The LUXOR[1]

is a themed resort suggestive of ancient Egypt.  The MANDALAY BAY[2] is suggestive of

pacific islands.  The PARIS CASINO RESORT[3] is suggestive of Paris, complete with a

massive Eiffel tower in front of the resort.  The RIVIERA[4] is suggestive of the French

---

1 LUXOR, Registration No. 1,741,984, is registered for hotel services in Class 42.
2 MANDALAY BAY, Registration No. 2,275,015, is registered for hotel, restaurant and bar services in Class 42.
3 PARIS CASINO RESORT, Registration No. 2465866, is registered for casino, hotel, and restaurant services in Classes 41 and 42.
4 RIVIERA, Registration No. 2297193, is registered for hotel and other services in Class 42.

-6-

Mark        :    MONTE CARLO
Serial No.  :    76/284329

Riviera. The VENETIAN RESORT HOTEL CASINO[5] is suggestive of traditional Venice.

NEW YORK NEW YORK HOTEL & CASINO[6] is suggestive of New York City, complete

with a one-third-scale replica of the New York skyline. The RIO[7] is suggestive of Rio de

Janeiro, Brazil. The BELLAGIO[8] is suggestive of quaint Italian lakeside villages, with a

lake in front of the resort itself. Likewise, MONTE CARLO is suggestive of the mystique

and regalia of Europe. None of the marks listed above are such that they describe the

services they offer. And, Applicant's mark is no more descriptive than the aforementioned

marks, which have already been granted registration on the Principal Register.

Las Vegas is also home to the STRATOSPHERE[9], a casino resort that towers over

the city at approximately 1,100 feet. While tall and similarly shaped, this building is not the

actual stratosphere. Clearly, consumers come to Las Vegas to experience the *façade* of

world-renown destinations. People are able to visit Las Vegas and pretend that they are in

Paris, New York, or Rio de Janeiro. They can pretend that they are on the Riviera or in the

stratosphere. Las Vegas visitors can indulge in the fantasy of being somewhere that they

are not. The consumer clearly knows that he or she is in Las Vegas, Nevada.

Nevertheless, the consumer can imagine that he or she is in another place or time. The

MONTE CARLO is just another such casino. Consumers can visit and imagine that they

are in another country. But, they know from the moment that they book a room, they are

---

5 VENETIAN RESORT HOTEL CASINO, Registration No. 2350633, is registered for casino and gaming
services in Class 41.
6 NEW YORK NEW YORK HOTEL & CASINO, Registration No. 2436898, is registered for resort hotel
services in Class 42.
7 RIO, Registration No. 1,997,791, is registered for hotel, restaurant and bar services in Class 42.
8 BELLAGIO, Registration No. 2,232,487, is registered for hotel and other services in Class 42.
9 STRATOSPHERE, Registration No. 2,086,401, is registered for hotel, restaurant and bar services in

-7-

Mark        :    MONTE CARLO
Serial No.  :    76/284329

still in the United States. Consumers who come to Las Vegas to visit the MONTE CARLO will come for the _feel_ of an exotic destination. Thus, at a minimum, the proposed mark is suggestive.

In addition, the case law is supportive of Applicant's analysis of the appropriateness of registrability in this case. In Forschner Group, Inc. Arrow Trading Co., 30 F.3d 348, 31 U.S.P.Q. 2d 1614 (2d Cir. 1994), the Court found that the fact that a term "evokes geographic associations does not, standing alone, support a finding of geographic descriptiveness." In the present case, MONTE CARLO evokes an exotic, foreign theme.

Further, geographic terms may have non-descriptive uses. The TTAB has held that the name of certain cities is registrable because they create a certain image in the mind of the consumer and do not designate merely a geographic location. In re Fred Gretsch Company, Inc., 159 USPQ 60 (TTAB 1968). For example, the word "NASHVILLE," although the name of a city in Tennessee, has been held as non-descriptive. See id. The Board reasoned that "NASHVILLE" could be suggestive of country and western style music, rather than solely descriptive of a location. Likewise, in Health Industries, Inc. v. European Health Spas, 489 F.Supp. 860 (D.C.S.D. 1980), the term "European" for a health club was deemed suggestive of "romantic overtones" rather than a geographic location. In this way the fanciful European theme of Applicant's casino is abundantly self-evident. Similarly, the term "Dixie" for insurance services in Birmingham, Alabama, was not primarily

Class 42.

-8-

Mark   :  MONTE CARLO
Serial No.  :  76/284329

indicative of geographical significance. In re Dixie Insurance Co., 223 USPQ 514 (TTAB 1984).

  The mark MONTE CARLO is used on Applicant's casino resort hotel in Las Vegas, Nevada.  No reasonable consumer would believe that he or she is in Monte Carlo or receiving services originating in Monte Carlo while at Applicant's Las Vegas casino.  As with other Las Vegas resort hotels and casinos, such as NEW YORK NEW YORK HOTEL & CASINO,[10] PARIS CASINO RESORT,[11] or VENETIAN RESORT HOTEL CASINO,[12] to name a few, reasonable consumers would recognize Applicant's mark as evoking an aura of an exotic destination and the theme of an overall property.  As such, Applicant's mark is suggestive, not descriptive.

  Even if Applicant's mark is both suggestive and descriptive, it is registrable.  For example, the mark "Sugar and Spice" was held not to be merely descriptive of bakery products because it called to mind and was suggestive of the Nursery Rhyme, "Sugar and Spice and Everything Nice...." In re Colonial Stores, Inc., 394 F.2d 594, 157 USPQ 382, 385 (CCPA 1968).  Similarly, the Trademark Trial and Appeal Board ("TTAB") found that the mark "Showroom on Line" was not merely descriptive of the computerized interior furnishings product information service but was suggestive as well.  In re TBG Inc., 229 USPQ 759, 760 (TTAB 1986).  Applicant's mark is also registrable on this basis.

---

10 PARIS CASINO RESORT, Registration No. 2465866, is registered for casino, hotel, and restaurant services in Classes 41 and 42.
11 NEW YORK NEW YORK HOTEL & CASINO, Registration No. 2436898, is registered for resort hotel services in Class 42.
12 VENETIAN RESORT HOTEL CASINO, Registration No. 2350633, is registered for casino and gaming services in Class 41.

-9-

Mark          :       MONTE CARLO
Serial No.    :      ·76/284329

Thus, Applicant's overarching use of the MONTE CARLO mark is not a geographically descriptive sense. Rather, it is arbitrary as applied to a resort casino in Las Vegas, Nevada. At the least, it is suggestive of an exotic, foreign location – a theme that is found prevalently on "The Strip" in Las Vegas.

**2.  MONTE CARLO is not primarily geographically deceptively misdescriptive because the mark is used to indicate style and theme.**

Applicant's use of MONTE CARLO is a stylish and fictitious theme that is reminiscent of an exotic location. The resort is suggestive of such a destination. Consumers can come to experience the feel of Europe. Indeed, this type of resort hotel casino theme is typical. Clearly, consumers want to experience the facade of world renown destinations. They are unlikely to believe that they are actually in Monte Carlo or receiving services from Monte Carlo.

People are able to visit these themed casinos and pretend that they are in Paris, or Rio de Janeiro. They can pretend that they are on the Riviera or in the stratosphere. Visitors can indulge in the fantasy of being somewhere that they are not. The consumer clearly knows that he or she is in a U.S. casino resort, and that the services from the theme casinos are also from there – not from Paris, Rio de Janeiro or the Riviera. The MONTE CARLO is just another such resort. Consumers can visit and imagine that they are in a distant land. But, they know from the moment they book a room that they are not going to Monte Carlo; that they are not getting goods or services that are from Monte Carlo; and that they are still in the United States.

-10-

Mark        :    MONTE CARLO
Serial No.  :    76/284329

Thus, at a minimum, the MONTE CARLO is suggestive of a style or theme. As such, the mark is used in a "fictitious, arbitrary, or fanciful manner," and as such "is protectable like any other nondescriptive term. Usage in such manner is not 'primarily' as a geographic designation." Loew's, 226 U.S.P.Q. at 867, and cases cited therein.

Moreover, Applicant argues that its mark is even arbitrary. Applicant submits that, as used, its MONTE CARLO mark is neither descriptive nor misdescriptive but arbitrary. "[I]f, because of the nature of the mark and/or goods involved, purchasers would fail to make.... a 'goods-place association' (that is, if they would not, upon seeing the mark, conclude that it imparts information about the geographical origin of the goods), the mark is arbitrary." In re House of Windsor, Inc., 221 U.S.P.Q. (BNA) 53, 55 (T.T.A.B. 1983).

Applicant submits that no reasonable consumer would make the required " goods-place" association, that is, believe that the Applicant's mark indicates the geographic origin of the Applicant's services. The mark MONTE CARLO is used on Applicant's resort hotel casino. In light of the fact that the resort that uses the term MONTE CARLO in an arbitrary, stylish sense, no reasonable consumer would believe that the Applicant's mark imparts information about the geographical origin of the services.

Rather than making a "goods-place association," i.e. erroneously believing that the Applicant's services originate from Monte Carlo, reasonable consumers would be much more likely to associate the mark MONTE CARLO as a fictitious and fanciful casino name that is reminiscent of a European vacation destination. As with other themed resort hotels and casinos such as the RIO, NEW YORK NEW YORK or the LUXOR, reasonable

-11-

Mark        :    MONTE CARLO
Serial No.  :    76/284329

consumers recognize the Applicant's mark as evoking an aura of an exotic destination and the theme of the overall property rather than designating the origin of the Applicant's services.

Furthermore, there are a wide variety of third party registrations that use MONTE CARLO in their mark for goods, none of which are owned by registrants outside of the United States. Applicant's mark is no more descriptive or deceptively misdescriptive than the registered marks. There is MONTE CARLO (Reg. No. 1040089) for automobiles; MONTE CARLO (Reg. No. 2430738) for metal license plates; MONTE CARLO (Reg. No. 2378914) for pressure-sensitive graphics for application to automobiles; MONTE CARLO (Reg. No. 1971177) for coffee; MONTE CARLO (Reg. No. 2255103) for towels; MONTE CARLO (Reg. No. 0899171) for flatware made of non-precious metal; MONTE CARLO (Reg. No. 0942743) for sunglasses; MONTE CARLO (Reg. No. 128287) for luggage; MONTE CARLO (Reg. No. 2036323) for men's shirts; and MONTE CARLO (Reg. No. 2199289) for ceiling fans and electric lighting fixtures.

Thus, the PTO has clearly taken the position that the term MONTE CARLO is not a term of "primary" geographic significance. Nor does the record of MONTE CARLO registrations reveal that the mark is descriptive.


## IV. CONCLUSION


-12-

# EXHIBIT G



LEWIS
AND
ROCA
—— LLP ——
L A W Y E R S

Michael J. McCue
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada 89109

Direct Dial:  702.949.8224
Direct Fax:  702.949.8363
mmccue@lrlaw.com
Admitted in: Nevada, Virginia,
and the District of Columbia

Our File Number:  42980-00001

**REDACTED**

February 5, 2008

<u>VIA EMAIL AND UNITED STATES MAIL</u>
Jonathan Scharf
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010

Re:    Victoria Partners adv. Societe Anonyme Des Baines
       <u>De Mer ET Du Cercle Des Etrangers A Monaco ("SBM")</u>

Dear Mr. Scharf:

**REDACTED**

fighting over individual trademark registrations in the USPTO or engaging in piecemeal litigation.

**REDACTED**



Jonathan Scharf
February 5, 2008
Page 2

**REDACTED**


**REDACTED**

continuing to litigate in the USPTO and potentially other fora in the future.

Sincerely,

LEWIS AND ROCA LLP

Michael J. McCue